J-S16010-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
MICHAEL A. JAMES :
:
Appellant : No. 201 WDA 2025

Appeal from the Judgment of Sentence Entered January 27, 2025
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0005025-2021

BEFORE: LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED: June 30, 2026**

Michael A. James appeals from the judgment of sentence, entered in the Court of Common Pleas of Allegheny County, after a jury convicted him of first-degree murder,[1] criminal conspiracy to commit homicide,[2] and carrying a firearm without a license.[3] After careful review, we affirm.

The trial court set forth the factual history of this matter as follows:

On January 16, 2021, shortly after 2:00 a.m., Pittsburgh Police officers were dispatched to the Marathon gas station on Frankstown Road for a ShotSpotter[4] notification. Upon arriving at the scene, they found Robert Agurs (victim)[,] who had

---

[1] 18 Pa.C.S.A. § 2502(a).

[2] *Id.* at § 903(a)(1); *id.* at § 2501(a).

[3] *Id.* at § 6106(a)(1).

[4] Pittsburgh Police Officer Jason Braun testified that "ShotSpotter" is an application that notifies police when gunshots are detected and provides the address where the shots were fired. *See* N.T. Jury Trial, 10/15/24, at 44-45.

sustained multiple gunshot wounds to the leg and torso. The victim was transported to UPMC Presbyterian[,] where he was pronounced dead. An autopsy was performed on the victim[;] three spent 9mm bullets were recovered from the victim with the manner of death ruled a homicide owing to the multiple gunshot wounds to his torso and extremities.

Shortly after the shooting, City of Pittsburgh homicide detectives responded to the scene and located, inter alia, fifteen 9mm shell casings containing the head stamp "FC 9mm+P," and seven fired bullets, all of which were later determined to have been fired from the same weapon. Detectives also recovered video from the gas station security system[,] which captured the [] shooting, and which will be discussed hereinbelow.

During the course of the investigation, detectives learned that the victim had been at "Club VIP" (club) prior to being shot. The victim arrived at the club around midnight and parked his vehicle in a lot across the street from the club. Shortly after the victim's arrival, three vehicles[—]a black Jeep, a Range Rover, and a Jaguar[—]arrived and parked in front of the club in a reserved section.

Club security officer, Asha Spruill, observed a known group, nicknamed the "Chicago Boys," in the Jaguar and Range Rover. She also observed a Jeep occupied by [James] (driver), Randall Jones (front seat passenger), and Dennis Alexander (rear seat passenger). Both Jones and Alexander went into the club with the other individuals while [James] remained in the Jeep the entire time the others were in the club. The group was in the club for approximately two hours prior to the victim exiting the club. Video surveillance showed that the victim exited the club shortly before 2:00 a.m. and drove out of the parking lot; the black Jeep followed the victim's vehicle to the Marathon gas station, which was only a few blocks away. Once the victim was outside his vehicle at the gas pumps, [Jones,] the front seat passenger[] of the Jeep[,] extended a weapon out of his window and shot the victim. The Jeep with the three occupants then fled the scene.

Minutes after the shooting[,] the Range Rover was pulled over by Pittsburgh Police, and the occupants were identified as Stephen and Tony Collins. The Collins brothers were not detained at that time, but the investigation developed them as suspects in putting out the contract on the victim. The investigation further revealed that the occupant of the Jaguar was Darrius Golden, also

suspected to be associated with the Collins brothers. The Jeep was identified as having an Indiana registration (FL362ABW), which was registered to Enterprise Rental Company, and had been rented by Ashton Taylor, the paramour of Dennis Alexander.

In the days that followed, detectives obtained a search warrant for Alexander's [R]ing account and located video recordings from inside his bedroom that depicted events in the hours after the murder. Alexander talked to an unknown male[,] indicating that they were "good," and "she" had turned the "bitch" in, referring to the Jeep being returned to the rental company. Additionally, Alexander spoke with a female on FaceTime indicating that "they" had gone to Trappers (Club VIP) that night, and that [James] stayed in the Jeep as the driver while [Alexander] and the others went inside the club. Alexander further stated that he knew the story would be on the news, but that he was not worried because [James] had pulled the Jeep into the gas station in a way as to obscure the license plate. Alexander indicated that a "hit" had been put out on the victim due to disputed drug[-]related activities. The video also showed Alexander talking to his cousin[,] indicating that she needed to get him out of the area because they had "dropped someone last night," and that they did it at the gas station.

[James], Alexander, and Jones had been together most of that day. [Alexander testified at trial as a Commonwealth witness pursuant to a plea agreement.] Alexander indicated that he was with both [James] and Jones at the time of the murder, and that [James] was driving the Jeep. Alexander provided a detailed description of the events to include: (1) after leaving the club together, Alexander got in the back passenger seat with [James] remaining in the driver seat and Jones entering the front passenger seat; (2) [James] then drove to the Marathon gas station, and[,] en route[, James] and Jones discussed shooting the victim; (3) minutes later[,] Jones pulled a firearm from the center console and shot the victim out of the passenger window; (4) that both [James] and Jones knew of the intended "hit" on the victim that night; (5) that [James] parked the Jeep at the gas station in a way that allowed for Jones to shoot the victim from the passenger window; (6) minutes after the shooting, [James] let Alexander out of the vehicle at a nearby apartment complex[,] where Alexander then contacted his girlfriend to call him an Uber home; (7) upon arriving home, [James] and Jones were at [Alexander's] residence[,] where the parties discussed what had happened and the "hit" on the victim; and (8) the three eventually

left the house when Collins picked them up, and went to Collins' house in North Versailles[,] where they reunited with Golden.

[James] was known to use the nickname "Waka" as well as "Flocka Flock," as evidenced by his Facebook page. Additional investigation revealed a series of text messages between [James] ("Waka" / "Flocka Flock") and Alexander shortly after the murder discussing Alexander trying to obtain a Lyft out of the area. Alexander's phone records also showed communication between the two back to April 26, 2020. Specifically, there were text messages between [James] and Alexander regarding paying [James] money, and the two exchanged various text messages involving depositing money into [James]'s account.

A search warrant was executed for [James]'s Timing Advance (TA) cellular records which placed [James] in the area of the club just prior to the shooting, in the area of the gas station at the time of the murder, in the area of the apartment complex Alexander was subsequently dropped off after the shooting, and in the area where the Jeep was returned to Alexander's residence. [James] was subsequently charged [with one count each of: first-degree murder, criminal conspiracy (homicide), carrying a firearm without a license, and tampering with evidence.[5]]

Trial Court Opinion, 8/6/25, at 5-9 (unnecessary capitalization, footnotes, and citations to record omitted).

James proceeded to a joint jury trial with co-defendant Jones on October 15, 2024, at the conclusion of which James was convicted of the above-mentioned offenses but was acquitted of tampering with evidence. On January 27, 2025, the trial court sentenced James to consecutive sentences of lifetime incarceration for first-degree murder, five to ten years'

---

[5] James was also charged with one count of persons not to possess a firearm. On October 7, 2024, the persons not to possess a firearm charge was severed from the other charges. *See* Trial Court Opinion, 8/6/25, at 2. This charge was ultimately *nolle prossed* by the Commonwealth. *Id.* at 3.

- 4 -

incarceration for conspiracy, and two to four years' incarceration for firearms not to be carried without a license. No post-sentence motions were filed.

James filed this timely appeal. Both the trial court and James have complied with the requirements of Pa.R.A.P. 1925. James raises the following claims for our review:

> 1. Whether there was sufficient evidence to prove first[-]degree murder when the Commonwealth failed to prove that [James] was an accomplice to the murder.
>
> 2. Whether there was sufficient evidence to prove conspiracy to commit first[-]degree murder when the Commonwealth failed to prove [James] agreed to kill the victim.

Appellant's Brief, at 7.

Both of James's issues on appeal challenge the sufficiency of the evidence. As such, and due to the similarity of his arguments on both issues, we will address them together. When reviewing a challenge to the sufficiency of the evidence, we are governed by the following standard:

> [W]hether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict-winner, was sufficient to enable the fact-finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. Additionally, when examining sufficiency issues, we bear in mind that: the Commonwealth's burden may be sustained by means of wholly circumstantial evidence; the entire trial record is evaluated and all evidence received against the defendant considered; and the trier of fact is free to believe all, part, or none of the evidence when evaluating witness credibility. This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based

- 5 -

on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.

***Commonwealth v. Dewald***, 317 A.3d 1020, 1038 (Pa. Super. 2024) (internal citations, quotations, brackets, and indentation omitted).

In his first claim, James argues the evidence was insufficient to prove he was an accomplice to first-degree murder, specifically that the Commonwealth failed to prove he had the specific intent to aid his co-defendant in killing the victim. ***See*** Appellant's Brief, at 15-18. Similarly, in his second issue, James contends that there was insufficient evidence to prove that there was an agreement between him and Jones to murder the victim, or that he had the specific intent necessary to commit conspiracy to commit murder. ***Id.*** at 19, 21.

In both claims, James avers that he was only the driver and "[his] mere presence . . . does not implicate him in a conspiracy and/or make him an accomplice." ***Id.*** at 14, 17, 21. In support of his claims, James contends that the only evidence that showed James "knew about the 'hit' was from [] Alexander," who was "thoroughly impeached" and that Alexander's testimony "should not be believed." ***Id.*** at 14, 17, 21-22. We disagree, as the evidence presented as trial, construed in the light most favorable to the Commonwealth, was sufficient to support James's convictions of first-degree murder and conspiracy.[6]

_____

[6] We note that, while James attempts to challenge the sufficiency of the evidence by asserting that Alexander's testimony was unworthy of belief, this

*(Footnote Continued Next Page)*

First-degree murder is an intentional killing, which is defined as a "willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(a), (d). "To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill." *Commonwealth v. Burno*, 94 A.3d 956, 969 (Pa. 2014) (citation omitted).

> Moreover, the jury may convict the defendant as an accomplice so long as the facts adequately support the conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote or facilitate the offense. The amount of aid need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime. However, simply knowing about the crime or being present at the scene is not enough.

_____

argument is more properly characterized as a challenge to the weight of the evidence. "[A] sufficiency of the evidence review does not include an assessment of credibility of testimony offered by the Commonwealth." *Commonwealth v. Juray*, 275 A.3d 1037, 1043 (Pa. Super. 2022) (citation omitted). "Questions concerning inconsistent testimony and improper motive go to the credibility of the witnesses. [An appellate court] cannot substitute its judgment for that of the jury on issues of credibility." *Commonwealth v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004). James did not challenge the weight of the evidence at sentencing or in a post-sentence motion, nor did he include this issue in his Rule 1925(b) statement. Therefore, to the extent James attempts to challenge the weight of the evidence, such a challenge is waived. *See Commonwealth v. Priest*, 18 A.3d 1235, 1239 (Pa. Super. 2011) (stating defendant's weight of evidence claim was "waived for failure to present claim in the lower court, either orally or in writing before sentencing or in a post-sentence motion, and failure to present argument in court-ordered statement, pursuant to Pa.R.Crim.P. 607; Pa.R.A.P. 1925(b)(4)(vii)") (citation omitted); *see also* Pa.R.A.P. 302(a) ( "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").

*Commonwealth v. Markman*, 916 A.2d 586, 597-98 (Pa. 2007) (internal citations and quotation marks omitted); *see also* 18 Pa.C.S.A. § 306(c)(1) (accomplice liability).

A defendant is guilty of conspiracy to commit first degree murder if: (1) he intends to commit or aid in the commission of the criminal act; (2) he enters into an agreement with another to engage in the crime; and (3) the defendant or another co-conspirator commits an overt act in furtherance of the agreed-upon crime. *Commonwealth v. Le*, 208 A.3d 960, 969 (Pa. 2019); *see also* 18 Pa.C.S.A. § 903(a) (elements of conspiracy). "The intent required for criminal conspiracy is identical to that required for accomplice liability. . . . [However, c]onspiracy requires proof of an additional factor which accomplice liability does not, namely[,] the existence of an agreement." *Commonwealth v. Murphy*, 795 A.2d 1025, 1038 (Pa. Super. 2002) (internal citations omitted).

Direct evidence of the defendant's criminal intent or the conspiratorial agreement is rarely available. *See Commonwealth v. Spotz*, 716 A.2d 580, 592 (Pa. 1998). Thus, "[a]n agreement sufficient to establish a conspiracy can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Commonwealth v. Geiger*, 944 A.2d 85, 90 (Pa. Super. 2008). Such conduct or circumstances may create "a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt."

*Commonwealth v. Jordan*, 212 A.3d 91, 97 (Pa. Super. 2019) (citation and internal quotation marks omitted). Like accomplice liability, co-conspirators can be convicted of first-degree murder, regardless of who inflicted the fatal wound. *Le*, 208 A.3d at 969.

Here, the evidence presented at trial, viewed in the light most favorable to the Commonwealth as the verdict winner, showed that James and Jones intended to and did, in fact, enter into an agreement to kill the victim, and that James's actions aided Jones in killing the victim. As outlined by the trial court, the evidence presented at trial showed that:

> [James] was with both Alexander and Jones on the day and evening of the murder. [James] drove Alexander and Jones to the club that night[] and waited in the Jeep as Jones and Alexander followed the victim into and out of the club. [James, as the driver,] subsequently followed the victim by vehicle when [the victim] left the club with [] Jones in the front passenger seat and Alexander in the rear passenger seat. En route[,] they discussed the ["]hit" on the victim and Jones retrieved the weapon from the center console [of the vehicle.] Once [at the gas station], [James] pulled the vehicle in parallel to the victim's car in order to allow Jones to more easily shoot the victim[,] as the victim was at the gas pumps. The three then fled the scene[ in the Jeep, with James driving].

Trial Court Opinion, 8/6/25, at 11.

Additionally, cellular phone communications were recovered showing discussion of money being deposited into James's account and James's cellular records placed James in the area of the club on the night of the shooting, at the gas station at the time of the murder, at the apartment complex where he dropped Alexander off, and in the area where the Jeep was ultimately left by

- 9 -

James and Jones. **See** N.T. Jury Trial, 10/16/24, at 248-49; **id.**, 10/18/24, at 493-503.

As detailed above, James's accomplice liability is supported by the evidence that he drove the Jeep and followed the victim to the gas station, discussed the "hit" with Jones en route to the gas station, maneuvered the Jeep in such a way to allow Jones to more easily shoot the victim, and drove away only after Jones fired at the victim. **See** N.T. Jury Trial, 10/15/24, at 122-25; **id.**, 10/16/24, at 185; **id.** at 191-95; **id.** at 202-03; **id.**, 10/17/24, at 359. Thus, the jury could reasonably have determined that James was not merely present at the scene, but that Jones had the specific intent of killing the victim and James aided Jones in that act. **See Commonwealth v. Falconer**, 341 A.3d 103, at *16 (Pa. Super. 2025) (Table)[7] (holding that appellant's actions—including driving principal to scene of crime; coordinating before and after shooting; driving vehicle next to victim's vehicle and slowing down so principal had opportunity to fire multiple rounds into victim's vehicle, before speeding off to elude apprehension; and appellant's subsequent discarding of evidence—established specific intent to aid principal in committing first-degree murder). Therefore, the evidence was sufficient to convict James of first-degree murder as an accomplice. **See Markman**, **supra**.

_____

[7] **See** Pa.R.A.P. 126(a)-(b) (unpublished, non-precedential memorandum decisions of this Court, filed after May 1, 2019, may be cited for persuasive value).

In addition to proving James's intent, the same evidence establishes the existence of a conspiracy to kill the victim. **See Geiger**, **supra**. The evidence showed that James participated in the criminal episode from its inception: he drove the vehicle to the club, waited for Jones and Alexander to exit the club and then followed the victim to the gas station, discussed the crime with Jones on the way to the gas station, positioned the vehicle in such a way to allow Jones to shoot the victim, and drove away from the scene of the crime immediately after the shooting. **See** N.T. Jury Trial, 10/16/24, at 175; **id.** at 191-95. **See Commonwealth v. Davalos**, 779 A.2d 1190, 1194 (Pa. Super. 2001) ("driver of a getaway vehicle can be found guilty as a co-conspirator if it is reasonable to infer that he was aware of the actual perpetrator's intention"); **see also Jordan**, 212 A.3d at 98 (finding conspiracy may be inferred where defendant was with shooter shortly before and shortly after shooting). Together, these facts create a "web of evidence" linking James to the conspiracy by proving his association with Jones, his knowledge of, and agreement with, the plan to kill the victim, his presence at the scene of the crime, and his flight therefrom. Thus, the record supports the jury's finding that James and Jones conspired to kill the victim and, accordingly, his second sufficiency claim has no merit.

In sum, we agree with the trial court that the evidence adduced at trial, when viewed in the light most favorable to the Commonwealth, was sufficient to sustain a finding that James acted in aid of his co-defendant in killing the victim and did so with the intent to facilitate the murder as part of a

- 11 -

conspiracy. Accordingly, James's conviction for first-degree murder and conspiracy to commit first-degree murder are supported by sufficient evidence and his issues on appeal do not warrant relief. *See Dewald*, *supra*.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 6/30/2026